# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                          Crim. No. 18-222 MV

JULIAN MADRID-QUEZADA,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendant Julian Madrid-Quezada's Motion to Suppress Statements and Tangible Evidence, filed November 1, 2018. Doc. 45. The government filed a Response on November 15, 2018. Doc. 46. The Court held an evidentiary hearing on May 8, 2019. Having reviewed the briefs, testimony, exhibits, and relevant law, for the reasons set forth below, the Court grants in part and denies in part Mr. Madrid-Quezada's Motion to Suppress.

## PROCEDURAL BACKGROUND

This case concerns Julian Madrid-Quezada's oral and written statements made on February 16, 2017, on the day of his arrest, as well as during a 2000 administrative encounter. On January 23, 2018, Mr. Madrid-Quezada was charged in a single-count Indictment with Reentry of a Removed Alien, in violation of 8 U.S.C. §§ 1326(a) and (b). Doc. 27. On November 1, 2018, he filed the instant Motion to Suppress, arguing that his oral and written statements, as well as the contents in his "Alien File" (A-File) should be suppressed because they were made after an illegal arrest and without proper advisement of his *Miranda* rights. Doc. 45. Mr. Madrid-Quezada additionally argued that the 2000 statements should be suppressed because he was not given

*Miranda* warnings nor advised of the criminal implications of his statements at the time the statements were made in 2000. Doc. 45 at ¶ 12.

The government responded that Mr. Madrid-Quezada is not entitled to the suppression of any evidence because his rights were not violated in the 2000 administrative encounter, nor were they violated in the 2017 administrative encounter or criminal custodial interview, the latter of which was preceded by sufficient *Miranda* warnings. Doc. 46 at 6.

The Court held an evidentiary hearing on May 8, 2019, during which it heard testimony from Immigration and Customs Enforcement (ICE) Deportation Officer (DO) Dean King and Mr. Madrid-Quezada. The Court took the Motion under advisement. The following represents the Court's essential findings of fact, based on the evidence submitted, as well as witness testimony, as required by Rule 12(e) of the Federal Rules of Criminal Procedure.

## FACTUAL BACKGROUND

On February 16, 2017, Julian Madrid-Quezada was encountered by Immigration and Customs Enforcement Agents at his residence in Albuquerque, New Mexico as a part of a targeted enforcement action. [Complaint Doc. 1 (Affidavit of Deportation Officer Dean King)]. Mr. Madrid-Quezada had been previously removed from the United States on August 17, 2000 and has convictions for alcohol-related conduct in 1999 and 2006, for which he was sentenced to terms of imprisonment. *Id.*; *see also* Doc. 46-2 (I-867A Form (Recorded Sworn Statement) dated 8/17/00). As a result of this history, ICE was "made aware of his presence by receiving a lead referral from one of [its] analysis targeting divisions." Hearing Transcript (Tr.)[1] at 5:14–15. The National Criminal Analysis and Targeting Center Lead Referral (Lead Referral), dated November 10, 2015 [Doc. 46-1], led to Mr. Madrid-Quezada's arrest in the instant offense.

---

[1] References to the Transcript are to the Draft copy.

ICE Deportation Officer Dean King, now a Supervisory Detention Deportation Officer, was a Deportation Officer for five years and has been employed with Homeland Security since 2003. Tr. at 4:12–25. DO King testified that ICE typically takes the lead referral and "further investigate[s] to try to confirm whether or not that's the same person . . . it's a targeted enforcement action at that point." Tr. at 5:23–25. He noted that lead referrals "could be" for individuals who do have status in the United States, which is something that the officers have to figure out whenever they receive the referral. Tr. at 56:12–22. In this case, the lead referral was dated 2015, but DO King did not receive it "until before the operation." Tr. at 59:8–20. He estimated receiving it three or four days prior to the operation. Tr. at 67:18–20.

DO King also indicated that as soon as an officer gets a "lead," referring to the Lead Referral, he or she "immediately . . . [orders] the A-File." Tr. at 12:12–13. In this case, ICE "had an operation we were getting ready to conduct" and "didn't have a lot of time . . . to do a lot of, you know, surveillance or investigation." Tr. at 6:17–20. DO King reported that there was not time in this case to "go out and try to confirm whether or not" an individual is "really here" because ICE "had to get so many targets acquired and identified and presented to headquarters . . . then we have so many days." Tr. at 29:6–19. DO King was not "really able to do a lot of pre-investigation beforehand," and could not recall how they came to search one—rather than a second, separately listed—address for Mr. Madrid-Quezada. Tr. at 29:20–21, 32:7–10. Regardless, Mr. Madrid-Quezada was a "viable target" who "became part of the operation," which DO King described as a "targeted enforcement action." Tr. at 5:25, 6:23, 30:7. The operation lasted three or four days and involved the arrest of multiple people, "all targeting previously removed felons and [aggravated] felons." Tr. 24:17–25:9, 26:23–25. As an individual with prior convictions, Mr. Madrid-Quezada was listed on the Lead Referral as an "Enforcement Priority: 1." Tr. at 31:1–10;

Doc. 46-1. He was "added last minute," though it was not clarified whether Mr. Madrid-Quezada was picked up on the first day of the operation, the last, or somewhere in between. Tr. at 54:11.

At the time of the instant offense, DO King was within the Fugitive Operations team under the Enforcement and Removal Operations (ERO) Unit. Tr. 26:11–15. ERO regularly initiates criminal prosecution, and DO King stated that he intended on the day of the instant offense to initiate a prosecution in this case. Tr. at 27:9–14. On the other hand, he also stated that while Mr. Madrid-Quezada may have been suspected of being in the United States in violation of 18 U.S.C. section 1326, "it wasn't 100 percent conclusive." Tr. at 30:22–25. He provided the following testimony in response to defense counsel's questions:

> Q: When you say that the lead referral doesn't always indicate an intent to arrest for criminal prosecution, when they're Enforcement Priority 1, you'd agree that it's more likely it's going to be a criminal --
>
> A: It's a possibility. But, again, sometimes -- if -- depending on the case, sometimes we have time to prepare a criminal case and get it ready before we will make an arrest. In this case, if I would have -- if we would have had time, I could have -- when I went to the Defendant's residence, I would have had an arrest warrant, a criminal arrest warrant, versus what I -- than what we had. But in this case, we weren't 100 percent sure that we were going to go through the prosecution of 1326 until after the arrest.
>
> But, typically, it's unknown to the officers usually if we can foresee a criminal prosecution or not. It depends on the case. It's varied case-by-case.
>
> Q: But your testimony is had you more time, you may have sought a criminal arrest warrant?
>
> A: Yes. I would have had enough probable cause to draft a criminal complaint and try to get a judge to sign a criminal arrest warrant based on the information I did have.

Tr. at 31:11–32:6. DO King reiterated later that "most likely" the individuals would be referred for 1326 prosecution, "but it's not always the case." Tr. at 63:25–64:3. He also stated that if he "would have had a little bit more information up front, I would have – definitely would have came and got an arrest warrant from the District Court in Albuquerque. That way this – you know, we

would have went a totally different route." Tr. at 64:5–9. However, because of the time limit, the "criminal initiation was done after the administrative warrant." Tr. at 64:12–13. DO King admitted, "I would have had a criminal arrest warrant . . . we would have – things would have been done differently. Upon encounter, obviously, he would have been Mirandized on the spot." Tr. at 64:16–19. He reiterated several times thereafter that "we could have done a lot more research" if he would have had more time. Tr. at 67:21–24. DO King estimated that he would have needed "a good week or two" to research "all the facts upfront" and "obtain[] a criminal arrest warrant." Tr. at 67:25–68:12. When asked by the Court to clarify what he needed to do, DO King stated that he would have verified the residence and "make sure that . . . the person is the same person who was prior removed." Tr. at 68:17–24. DO King then stated that he did not believe he had probable cause for a criminal arrest when he initially encountered Mr. Madrid-Quezada. Tr. at 69:6–13.

DO King did receive an administrative warrant to detain or remove Mr. Madrid-Quezada. Doc. 46 at ¶ 13, 46-3 (Ex. 3, I-205 Warrant of Removal/Deportation); Tr. at 7:3–4, 17:13–15. The warrant is dated February 16, 2017, and signed by the ICE Field Officer Director on February 17, 2017, the day after Mr. Madrid-Quezada was arrested and interviewed. *See* Doc. 46-3. There is no judicial branch officer, magistrate, or judge involved in the process. Tr. at 24:5–7. The administrative warrant is not an arrest warrant, and it would not allow DO King to enter Mr. Madrid-Quezada's home to arrest him. Doc. 46 at ¶ 16; Tr. at 19:4–5. There is no time stamp on the administrative warrant, but it was obtained the same day that Mr. Madrid-Quezada was taken into custody at his home. Tr. at 20:23–21:10. DO King's report indicates that the operation began at 10:00 a.m. on February 16, 2017. Tr. 21:13–20. However, Mr. Madrid-Quezada estimated that the officers were at his home at approximately 6:30 a.m. Tr. at 72:7–11. DO King testified that the I-205 Warrant "was done during processing" of Mr. Madrid-Quezada, "[a]fter he was put into

custody," but DO King could not recall "if we had it in the field, or if it was in his file at the office." Tr. at 22:14–24. He also had a I-200 Form ("Administrative Arrest Warrant"), which precedes the I-205 and similarly allows the ICE officer to take an individual into custody if the officer encounters that person. Tr. at 83:4–14.

DO King also testified that he had the power to arrest someone for immigration violations *without* a warrant. Tr. at 57:3–5. He admitted that there are limits on that authority. Tr. at 57:17–24. For example, he cannot go into a home and speak to someone with an administrative warrant if he does not have consent. Tr. at 58:4–8.

On the morning of February 16, 2017, DO King went to Mr. Madrid-Quezada's home. DO King testified that he approached a female outside of the building who said she knew Mr. Madrid-Quezada, and without prompting from DO King, she knocked on his door. Tr. at 7:12–18. He recalled that Mr. Madrid-Quezada "walked out and made contact with [ICE]. . . .[he] came out to the vehicle in the parking area." Doc. 46 at ¶ 17; Tr. at 7:19, 8:2, 44:25–45:1. However, Mr. Madrid-Quezada testified that he was in front of the door when he was immediately handcuffed after affirming his name to the three officers. Tr. at 72:22–73:8. After being arrested, Mr. Madrid-Quezada testified, he was "pulled [] out" of the door and saw two officers "further ahead" with rifles. Tr. at 73: 13–18.

DO King stated that the officers identified themselves as immigration officers, employed with Homeland Security, in addition to being dressed in vests that have markings indicating their affiliation. Tr. at 8:9–12, 45:4–12, 74:6–7. There were approximately five or six other officers in the yard with DO King, each with their own unmarked SUV. Tr. at 8:21, 26:2–10, 45:13–18, 74:1–3. Each officer was carrying a firearm, at least one of whom was carrying a rifle that was not concealed. Tr. at 45:19–46:9. DO King believed that "two or three" officers approached the

residence, while the rest of the team "usually" or "probably" remained in the outlying area. Tr. at 48:17–25.

In response to being asked his nationality, DO King stated that Mr. Madrid-Quezada said, "I have been previously removed from the United States." Tr. at 47:11–25, 57:10–12. Mr. Madrid-Quezada denied making such a statement; rather, he stated that he told ICE he was a resident, "and they said that didn't matter." Tr. at 74:10–11. Mr. Madrid-Quezada recalled a Spanish-speaking ICE officer telling him "that they were cleaning up the area" on President Trump's orders. Tr. at 74:17–75:3.

Questions were asked of Mr. Madrid-Quezada over a short period of time, although DO King could only estimate what was "typical" of such encounters: "anywhere from 2 or 3 minutes to 10, 15 minutes." Tr. at 48:14–16. When the Court asked DO King about the complexity of these questions, he indicated Mr. Madrid-Quezada answered "yeah" and would repeat the questions back to DO King or respond with an action—such as producing his identification when asked whether he had it on him. Tr. at 60:15–25. He could not recall whether Mr. Madrid-Quezada answered using more than one or two words, and admitted that the questions did not call for long explanations. Tr. at 61:13–15, 62:5–7. DO King also testified that Mr. Madrid-Quezada claimed to be a painter, but Mr. Madrid Quezada explained on direct that he is a roofer, not a painter. Tr. at 60:20, 71:19–22.

DO King stated that Mr. Madrid-Quezada "produced a New Mexico identification card" at DO King's request, which was made in English. Tr. at 8:12–13, 48:5–11. DO King added, "He spoke real good English." Tr. at 8:12, 55:13–17. He noted that he offered to speak to Mr. Madrid-Quezada in Spanish, but "he indicated he was very comfortable in English" and that English was his primary language. Tr. at 54:18–25, 55:12–13, 61:3–4. DO King admitted that his Spanish is

limited.  Tr. at 61:23.  Meanwhile, Mr. Madrid-Quezada testified that he told the officers he could "speak some English, but you have to speak very slowly to me, because if you do speak fast, I won't be able to understand you."  Tr. at 76:10–17.  Mr. Madrid-Quezada has achieved a fifth-grade education, and took classes in English but has never attended English-speaking classes.  Tr. at 80:3–9.  He acknowledged that he "sometimes" speaks in English to his roofing clients, and his children also speak to him in English but do so slowly.  Tr. at 78:12–15, 78:20–79:2, 79:12–18.  Mr. Madrid-Quezada noted that he feels "very at ease" with his children, which makes it easier to understand English than when he is nervous.  Tr. at 79:19–23.  Similarly, he stated there are other English speakers present when he needs to speak to his roofing customers in English.  Tr. at 79:24–80:2.

Once the "identification was made, [ICE] placed the subject – the Defendant under arrest and took him to the office for further interview and questioning."  Tr. at 8:17–19.  DO King testified that the ICE team "got out of the area as quick as possible."  Tr. at 9:10.

Mr. Madrid-Quezada was then transported to a local ICE office.  In the police car, DO King recalled that Mr. Madrid-Quezada was "talking about his situation . . . with his ex-wife, and he was detailing . . . what happened with his divorce," though Mr. Madrid-Quezada only recalled asking, "What was going to happen to me."  Tr. at 62:22–25, 80:19–81:1.  DO King denied asking Mr. Madrid-Quezada questions, and could not recall how the topic came up.  Tr. at 63:8–19.  DO King went on to explain how he described the criminal process to Mr. Madrid-Quezada while he was being transported to the ICE office.  Tr. at 66:11–67:6.

At the ICE office, DO King "ran his fingerprints, got biographical information, name, date of birth.  As part of the process, we did a sworn statement, basically real routine stuff, just confirming identity under oath, where he's born . . ."  Tr. at 9:14–17.  DO King described these

activities as "routine" questions "we always ask." Tr. at 9:16, 18. He testified that "at that point, it was determined" that Mr. Madrid-Quezada had previously been deported and had a criminal history, although this information is clearly stated in the Lead Referral. Tr. at 9:22–6; *see also* Doc. 46-1. He also later stated, "based on the records checks and based on the information we already had, we already knew this was a prior removal and that . . . this person was previously deported." Tr. at 12:17–20. The A-File, received after the Lead Referral but likely before taking Mr. Madrid-Quezada into custody, "all reaffirmed" what was already known. Tr. at 12:21–22, 38:16–39:12. After corroborating Mr. Madrid-Quezada's identity, DO King had Mr. Madrid-Quezada sign and put his fingerprint on the back of the I-205 Warrant for Removal/Deportation. Tr. at 19:24–13.

DO King stated that "based on the totality of that," referring to the criminal history and prior removal, "we proceeded to go criminal under 8 U.S.C. 1326." Tr. at 10:7–8. DO King stated that "once it became . . . very apparent and we had to file -- we had everything . . . based on . . . previous criminal convictions with the state or the country, and based on the fact that he has a prior removal, then that's [when] we initiated the criminal process." Tr. at 27:21–25. The process went from administrative to criminal, and DO King filled out the criminal complaint for this case. Tr. at 24:10–11, 27:25–2. The process all happened on the same day, within hours of arresting Mr. Madrid-Quezada. Tr. at 28:3–7.

Only after initiating the criminal prosecution did DO King provide *Miranda* warnings to Mr. Madrid-Quezada in English. Doc. 45 at ¶ 3; Doc. 46 at ¶¶ 22, 24; Tr. at 10:9–10. The form indicates that Mr. Madrid-Quezada was taken into custody at 12:00 p.m. on February 16, 2017, and that he signed the form at the same time, although DO King also testified that he arrived at Mr. Madrid-Quezada's residence at 10:00 a.m. Tr. at 52:7–53:11. DO King did not know why

the custody time was listed as 12:00 p.m., though he stated it could have been a mistake or a reflection that the interaction started as "purely administrative until the point we discovered that the elements of 8 U.S.C. 1326 existed" and the case became criminal.  Tr. at 53:12–23.

Although DO King initially stated that Mr. Madrid-Quezada was "Mirandized, in English, in Spanish, the rights were read to him, and a copy of the notice was given to him," he later clarified that the *Miranda* warnings were never read in Spanish.  Tr. 10:9–11; 50:4–6.  However, the back side of the statement of rights form, the rights are written in Spanish.  Tr. 50:2–3, 50:11–15.  DO King recalled that Mr. Madrid-Quezada "said he understood it, and then he signed, and he waived his rights, and then we proceeded."  Tr. at 51:21–22.  Mr. Madrid-Quezada testified that he asked what the form was, but was told "No, just go ahead and sign it."  Tr. at 75:17–24.  He also stated that he did not, and could not, read either side of the form because he did not have his glasses with him that day, and he told the officers that he needed his glasses.  Tr. at 75:24–25, 77:2–12.  Although the officers offered to read it to him, they did not read it, and only told Mr. Madrid-Quezada "it was for [his] rights."  Tr. at 75:24, 76:6–9.  Mr. Madrid-Quezada did not ask any questions after signing the form, and was not told that he could choose not to sign it.  Tr. at 77:13–18.  DO King could not recall whether Mr. Madrid-Quezada informed him that he could not read the form because he did not have his glasses.  Tr. at 51:15–17.

Mr. Madrid-Quezada stated that he "is not a competent English speaker."  Doc. 45 at ¶ 3.  At the hearing, DO King confirmed that the 2000 form indicates that Mr. Madrid-Quezada was previously interviewed and given his rights (jurat) in Spanish.  Tr. at 33:20–10.  DO King testified that Mr. Madrid-Quezada only spoke to him in English despite being offered to speak in Spanish.  Tr. at 10:17–21.  According to DO King, Mr. Madrid-Quezada told DO King he was "good in English" and even "preferred English."  Tr. at 10:21–22, 43:10.  And DO King observed that Mr.

Madrid-Quezada "was pretty proficient in English." Tr. at 43:4. DO King and another agent were present when Mr. Madrid-Quezada waived his *Miranda* rights in English. Tr. 10:11, 10:23–11:2. The Court notes that Mr. Madrid-Quezada was assisted by a Spanish interpreter on the day of the evidentiary hearing.

## LEGAL STANDARD

### I. Criminal and Administrative Arrests

The Fourth Amendment protects individuals' right to be free from unreasonable searches and seizures, and it protects against the physical entry of the home. U.S. Const. amend. IV; *Payton v. New York*, 445 U.S. 573, 584–86 (1980). To be reasonable, a search or seizure must be supported by probable cause. *See Brinegar v. United States*, 338 U.S. 160, 174–76 (1949) ("Probable cause exists where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed."). Probable cause is based on the "totality-of-the-circumstances" and is evaluated based on "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983). An action is thus "reasonable" under the Fourth Amendment," regardless of the individual officer's state of mind, as long as the circumstances, viewed *objectively*, justify [the] action." *Brigham v. Stuart*, 547 U.S. 398, 404 (2006) (citing *Scott v. United States*, 436 U.S. 128, 138 (1978)).

Searches and seizures in a home without a warrant are presumptively unreasonable. *Payton*, 445 U.S. at 586. The Fourth Amendment prohibits police officers from making a "warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." *Id*. at 576. Officers may lawfully enter a home without consent and conduct a warrantless

arrest only where both probable cause and exigent circumstances exist.  *United States v. Reeves*, 524 F.3d 1161, 1169 (10th Cir. 2008) (quoting *Payton*, 445 U.S. at 590).  The government bears the burden of showing that the officers had probable cause and that exigent circumstances existed such that the warrantless entry was necessary.  *United States v. Chavez*, 812 F.3d 1295, 1298 (10th Cir. 1987).  Additionally, where "the primary object of the search is to gather evidence of criminal activity, a criminal search warrant may be obtained only on a showing of probable cause to believe that relevant evidence will be found in the place to be searched."  *Michigan v. Clifford*, 464 U.S. 287, 294 (1984).  If administrative searches can be converted to serve the needs of law enforcement officials, traditional protections from police intrusion would be neutralized and carefully protected Constitutional rights of the criminally accused would be violated.

An officers' "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis," *Whren v. United States*, 517 U.S. 806, 812 (1996), and "the validity of an arrest is to be determined . . . by making an objective inquiry into what the fourth amendment would allow in the circumstances that the particular case presents."  *United States v. Clarke*, 110 F.3d 612, 614 (10th Cir. 1990).

The Fourth Amendment allows for search or seizure absent probable cause of criminal activity in certain administrative contexts.  *See Michigan v. Sitz*, 486 U.S. 444 (1990) (drunk-driving checkpoints); *New York v. Burger*, 482 U.S. 691 (1987) (administrative inspections of automobile junkyards); *United States v. Martinez-Fuerte*, 482 U.S. 543 (1976) (temporary seizures at permanent border patrol checkpoints).  A similar administrative exception allows for immigration detention without probable cause of criminal activity "as part of the means necessary to give effect to the provisions for the exclusion or expulsion of aliens."  *Wong Wing v. United States*, 163 U.S. 228, 235 (1896).  Section 287(a)(1) of the Immigration and Nationality Act

authorizes any officer or employee of the Immigration and Naturalization Service (INS) without a warrant, "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1) (2006). The only geographical limitation on this authority except that it must be "within a reasonable distance from any external boundary of the United States." 8 U.S.C. § 1357(a)(3).

The exceptions to the warrant and probable cause requirements are predicated on the administrative purpose of the government action. It is well established that administrative seizures or searches cannot be undertaken for the purpose of criminal investigation. *City of Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000) (seizure); *Michigan v. Clifford*, 464 U.S. 287, 294 (1984) (search).

## II.     Right to Counsel in Immigration Proceedings

The Sixth Amendment right to counsel attaches at the commencement of an adversarial judicial proceeding. *Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191 (2008). The Sixth Amendment right to counsel thus "applies at the first appearance before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty. *Id.* at 194. However, because deportation proceedings are civil in nature, there is no Sixth Amendment right to counsel in such proceedings. *See Michelson v. I.N.S.*, 897 F.2d 465, 467 (10th Cir. 1990); *see also Trench v. I.N.S.*, 783 F.2d 181, 183 (10th Cir.), *cert. denied*, 479 U.S. 961 (1986).

## III.    Statements While in Custody

### a.  Generally

Under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), "a confession obtained during a 'custodial interrogation' may not be used by the prosecution against the defendant unless the prosecution demonstrates the use of procedural safeguards effective to secure the Fifth

Amendment privilege against self-incrimination." *United States v. Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008). The Supreme Court held that the person being interrogated in custody must be "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444. These warnings are required any time an individual is subject to custodial interrogation. Any waiver of one's rights must be made voluntarily, knowingly, and intelligently. *United States v. Burson*, 531 F.3d 1254, 1256 (10th Cir. 2008).

A waiver is knowing and intelligent if it is made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Warnings given in a language which the defendant cannot comprehend do not convey the substance of the suspect's rights, but need not be a perfect translation in order to convey the substance of the rights waived. *See United States v. Bustillos–Munoz*, 235 F.3d 505, 517 (10th Cir.2000) (waiver knowing and intelligent because imperfect translation into a language which defendant understood conveyed the substance of the rights waived); *United States v. Hernandez*, 93 F.3d 1493, 1502 (10th Cir.1996) (same); *United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir.1990) (acknowledging that language barriers may inhibit a suspect's ability to knowingly and intelligently waive his Miranda rights). "Whether [a defendant] understood his Miranda rights is a question of fact, which underlies the legal question of whether his waiver was knowing and intelligent." *Valdez v. Ward*, 219 F.3d 1222, 1231 (10th Cir. 2000) (citations omitted). In assessing the totality of the circumstances surrounding a *Miranda* waiver, the court may consider the individual's age, intelligence, education, language ability, mental condition, experience with the legal system, pressure from law enforcement officers, the explicitness of the

waiver, and the length of time between the *Miranda* warning and questioning. *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).

    b.  Immigration Proceedings

The Supreme Court has made clear that a deportation proceeding is civil in nature and, as a result, "various protections that apply in the context of a criminal trial do not apply." *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984); *see also Michelson v. I.N.S.*, 897 F.2d 465, 467 (10th Cir. 1990). Among such protections not available during an immigration proceeding is the right to *Miranda*-type warnings of the right to remain silent. *United States v. Valdez*, 917 F.2d 466, 469 (10th Cir. 1990); *United States v. Gupta*, 183 F.3d 615, 617 (7th Cir.1999) ("A person seeking entry into the United States does not have a right to remain silent.").

Questions may be asked of individuals at border checkpoints in the absence of individualized suspicion. *United States v. Sanders*, 937 F.2d 1495 (10th Cir. 1991) (citing *United States v. Martinez-Fuerte*, 428 U.S. 543, 563 (1976)); *see also United States v. Benitez*, 899 F.2d 995, 998 (10th Cir. 1990). The Tenth Circuit has concluded that routine stops at a fixed border checkpoint, even if a seizure under the Fourth Amendment, are not custodial for *Miranda* purposes. *United States v. Hudson*, 210 F.3d 1184, 1191 (10th Cir. 2000). While an "alien" is unquestionably "in custody" until he is admitted to the country, normal *Miranda* rules simply cannot apply to this unique situation at the border. *See Gupta*, 183 F.3d at 617–18 ("*Miranda* therefore is a mismatch for the immigration process, at least at the outset. . . . [P]ersons seeking entry at the border may be questioned without *Miranda* warnings, even though they are also subject to custody. . . ."). This is a situation utterly unlike a normal law enforcement setting. *United States v. Kiam*, 432 F.3d 524, 529 (3d Cir. 2006). However, any further detention must be based on the individual's consent

or probable cause, or upon a valid investigative detention. *United States v. Espinosa*, 782 F.2d 888, 890, 891 (10th Cir. 1986).

In some narrow instances, at least one court has suggested, if an officer is aware of the potential for incriminating responses, an individual in custody may need to be informed of *Miranda* warnings. *See United States v. Rodriguez*, 356 F.3d 254 (2d Cir. 2004) (finding that individual interviewed by Immigration and Naturalization Service agent while incarcerated on unrelated state charges—and thus "in custody"—need not be given *Miranda* warnings where the agent was unaware of potentially incriminatory nature of the disclosures he sought). Thus, if an individual is questioned in connection with possible deportation proceedings, he need not be given *Miranda* warnings even when that information became relevant to a later criminal proceeding for illegal reentry. *See id.*; *see also United States v. Montoya-Robles*, 935 F.Supp. 1196, 1201–02 (D. Utah 1996) (collecting cases on unwarned statements allowed in subsequent immigration proceedings).

Statements made to border patrol agents may also be rendered inadmissible where the statements about one's identity and nationality followed an *illegal* arrest. *United States v. Olivares-Rangel*, 458 F.3d 1104 (10th Cir. 2006). In such circumstances, the Court must examine whether an individual's statements are tainted by the illegal arrest and therefore inadmissible, or sufficiently attenuated as to permit the admission of the statements. *Olivares-Rangel*, 458 F.3d at 1112 (citing *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)); *see also United States v. Mendoza-Lopez*, 481 U.S. 828 (1987).

c. Standard

On a motion to suppress an individual's statement allegedly obtained in violation of their *Miranda* rights, the government bears the burden of proving by preponderance of evidence that

the individual's rights were not violated. *See United States v. Gell-Iren*, 146 F.3d 827, 830 (10th Cir. 1998). "Whenever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, the State need prove waiver only by a preponderance of the evidence." *United States v. Rosenschein*, No. CR 16-4571 JCH, 2019 WL 764590, at *1 (D.N.M. Feb. 21, 2019) (citing *Colorado v. Connelly*, 479 U.S. 157, 168, (1986)). Other districts in this Circuit consider it a heavy burden. *See, e.g.*, *United States v. Khan*, 324 F.Supp.2d 1177, 1185 (D. Colo. July 12, 2004) ("When a *Miranda* violation is alleged, the heavy burden of proof is upon the government to show the validity of the waiver by a preponderance of the evidence.").

## IV.    Identity Information

Close examination of *Lopez-Mendoza*, as well as Supreme Court precedent, makes clear that *Lopez-Mendoza* does not prohibit the suppression of evidence of a defendant's identity. In *Olivares-Rangel*, the Tenth Circuit held: "A defendant may still seek suppression of specific pieces of evidence (such as, say, fingerprints or statements) under the ordinary rules announced in *Mapp* [*v. Ohio*, 367 U.S. 643, 648 (1961)] and *Wong Sun*." *Id.* at 1111. However, evidence that is obtained "as part of a routine booking or processing procedure," including fingerprints or booking photos, can only be suppressed if the illegal arrest was "purposefully exploited for the objective of obtaining fingerprints." *Id.* at 1115–16. "[I]n the absence of evidence that the illegal arrest was purposefully exploited for investigatory objectives, fingerprints taken as part of a routine, booking procedure are not fruit of a poisonous tree." *Id.* This determination depends on "[t]he precise circumstances under which Defendant was arrested and his fingerprints taken." *Id.* at 1116.

The Fourth and Eighth Circuits have also interpreted *Lopez-Mendoza* to permit the suppression of identity-related information. *See United States v. Oscar-Torres*, 507 F.3d 224, 228

(4th Cir. 2007); *United States v. Guevara-Martinez*, 262 F.3d 751, 754–55 (8th Cir. 2001). These Circuits hold that fingerprints are suppressible if taken for an investigatory purpose, such as criminal prosecution, rather than for an administrative purpose such as civil deportation proceedings. *Oscar-Torres*, 507 F.3d at 230–32 (remanding for further development of the record on this point); *see also Guevara-Martinez*, 262 F.3d at 756 (suppressing fingerprints because they were a product of unlawful detention). These circuits have clarified that the statement in *Lopez-Mendoza* that a defendant's body or identity is not suppressible is a *jurisdictional*, not an evidentiary or Fourth Amendment, rule. They have also suppressed identity-related statements. *See Olivares-Rangel*, 458 F.3d at 1112. The Ninth Circuit has also concluded that fingerprint evidence is not automatically exempt from the exclusionary rule if the fingerprints were obtained for investigatory purposes, as opposed to taken merely for the purpose of identification. *See United States v. Garcia-Beltran*, 389 F.3d 864 (9th Cir. 2004)

These holdings are consistent with Supreme Court precedent that, "when an illegal arrest was used as an investigatory devise [*sic*] to obtain fingerprints, the fingerprints were regarded as inadmissible fruit of an illegal detention." *Olivares-Rangel*, 458 F.3d at 1114 (citing *Davis v. Mississippi*, 394 U.S. 721, 727–28 (1969); *Hayes v. Florida*, 470 U.S. 811, 817–18 (1985)). The Tenth Circuit also affirmed the suppression of a defendant's statements concerning his identity and nationality. *Id.* at 1112 (noting that the "taint from Defendant's illegal arrest had not become sufficiently attenuated so as to permit admission of Defendant's incriminating statements"). Consequently, a person's immigration file could be suppressed as a tainted fruit of an unlawful stop. *Id.* at 1119. The government bears the burden of introducing evidence to show that an individual's fingerprints were obtained as part of a routine booking process rather than for the

purpose of comparing them to his immigration file or prior criminal record for purposes of criminal prosecution. *See United States v. Meza*, 2014 WL 201598 at *2 (D. Colo. Jan. 17, 2014).

The "Fourth, Eighth, and Tenth Circuits . . . correctly distinguish between such a broad attempt to suppress one's identity itself and an attempt to suppress evidence relating to one's identity, such as statements made during an unlawful arrest." *United States v. Hernandez-Mandujano*, 721 F.3d 345, 355 (5th Cir. 2013) (Jolly, J., specially concurring) (citing *Oscar-Torres*, 507 F.3d at 228; *Olivares-Rangel*, 458 F.3d at 1106; *Guevara-Martinez*, 262 F.3d at 754–55).

## DISCUSSION

**I.** **Mr. Madrid-Quezada's 2000 Administrative Arrest and Questioning Was Proper and His Statements Will Not be Suppressed.**

Mr. Madrid-Quezada's 2000 administrative arrest did not require that he receive and waive *Miranda* rights before being questioned. Although the consequences of deportation may be severe, deportation proceedings have been consistently classified as civil rather than criminal. *Costello v. I.N.S.*, 376 U.S. 120, 128 (1964); *Woodby v. I.N.S.*, 385 U.S. 276 (1966). Thus, while an individual is entitled to due process in deportation proceedings, *Wong Yang Sung v. McGrath*, 339 U.S. 33 (1950), such proceedings are "not subject to the constitutional safeguards for criminal prosecutions." *Abel v. United States*, 362 U.S. 217, 237 (1960).

Additionally, there is no indication that the officer who questioned Mr. Madrid-Quezada in 2000 had any reasonable expectation that the statements would be used for future criminal prosecution. *See Rodriguez*, 356 F.3d 254 (2004). *Miranda* warnings are required during custodial interrogations and where the officer should have known that the questions "were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 466 U.S 291, 303 (1980). Questioning at the border involves a balance between the need for immigration authorities to effectively

discharge their duties with respect to administration of our immigration laws and the constitutional prohibition against self-incrimination. On one hand, immigration authorities have a legitimate administrative responsibility to ascertain the legality of an individual's presence in the United States by investigating that individual's immigration status. On the other, an individual's immigration status is often directly relevant to an element of a crime that immigration officials can and do investigate. The balance is not to require a new framework related to the custodial interrogation by immigration officers, but to determine whether the individual has been subjected to interrogation within the meaning of *Miranda*.

Therefore, the Court must consider whether the officer knew that his questioning, in 2000, was reasonably likely to elicit an incriminating response. In *United States v. Salgado*, 292 F.3d 1169 (9th Cir. 2002), the defendant had been arrested on state charges unrelated to his immigration status. While being held in a state facility, a federal immigration officer was referred to Mr. Salgado by state officials based on Mr. Salgado's statement that he had been born outside of the United States. 292 F.3d at 1171. The immigration officer interviewed Mr. Salgado at the jail without providing *Miranda* warnings and stated his purpose for interviewing Mr. Salgado was to determine whether Mr. Salgado was subject to deportation. *Id.* Mr. Salgado was asked, and answered, questions about his immigration status. *Id.* He was subsequently deported. *Id.* Within a year of his deportation, Mr. Salgado illegally reentered the United States, was again arrested on state charges unrelated to his immigration status, and the statements he had previously made were admitted over his objection at a criminal trial where he was charged with illegal reentry after deportation. *Id.* at 1172. The Ninth Circuit affirmed the district court's ruling to admit the statements on the ground that the immigration officer could not reasonably have suspected that the

questions she asked Mr. Salgado were likely to elicit a response that would become incriminating in Mr. Salgado's future illegal reentry into the United States. *Id.* at 1173.

Here, as in *Salgado*, Mr. Madrid-Quezada was asked in 2000 to provide information only about his immigration status for the purposes of determining whether he was subject to administrative action for deportation. Also, as in *Rodriguez*, where the officer's questioning similarly fit the purpose of the interview and the evidence was not used in a criminal proceeding until three years later, no *Miranda* warning was required before Mr. Madrid-Quezada was questioned by Immigration Inspector Lazcano in 2000. There is no evidence that Inspector Lazcano intended or should have known that his questions would elicit incriminating responses by Mr. Madrid-Quezada. Instead, the results of the interview were congruent with the purpose of the interview: to deport Mr. Madrid-Quezada. These statements did not become relevant to possible criminal prosecution until nearly two decades later.

Accordingly, the Court denies Mr. Madrid-Quezada's motion as it pertains to his 2000 statements.

## II. Mr. Madrid-Quezada was not Entitled to Counsel in 2000.

There is no Sixth Amendment right to counsel attaches in immigration proceedings, such as the one Mr. Madrid-Quezada was a part of in 2000. *See Michelson v. I.N.S.*, 897 F.2d 465, 467 (10th Cir. 1990); *see also Trench v. I.N.S.*, 783 F.2d 181, 183 (10th Cir.), cert. denied, 479 U.S. 961 (1986).

Accordingly, the Court denies Mr. Madrid-Quezada's motion as it pertains to his right to counsel during the 2000 encounter with Inspector Lazcano.

### III. Mr. Madrid-Quezada's 2017 Arrest was Illegal.

Mr. Madrid-Quezada was subject to an administrative warrant that, objectively, was used as a pretext to gather evidence of criminal activity and effectively circumvented the necessary procedural protections afforded by the Constitution. An immigration detention, like any other administrative seizure, may not be misused for the purpose of conducting a criminal investigation. *See Abel v. United States*, 362 U.S. 217 (1960). In *Abel*, a non-citizen was arrested pursuant to an administrative warrant issued pursuant to laws and regulations setting for the procedure for the deportation of aliens. Mr. Abel claimed that his immigration arrest was a "pretense and sham" undertaken to permit the government to place him in custody and search his belongings for evidence of espionage, and therefore an unreasonable seizure of his person. *Id.* at 225–26. The Court upheld the search based on the trial court's factual finding that Abel's arrest was not directed nor supervised by the Federal Bureau of Investigation, and that the immigration officials had treated Mr. Abel no differently than any other deportable non-citizen. *Id.* at 226–28.

In rejecting Mr. Abel's challenge, the Court noted that it was acceptable for two branches of the Department of Justice to cooperate and concluded that the claim "that the Government used this administrative warrant for entirely illegitimate purposes" was not "justified by the record." *Id.* at 226. However, the Court stated, that had the claim been justified

> it would indeed reveal a serious misconduct by law-enforcing officers. The deliberate use by the Government of an administrative warrant for the purpose of gathering evidence in a criminal case must meet stern resistance by the courts. The preliminary stages of criminal prosecution must be pursued in strict obedience to the safeguards and restrictions of the Constitution and laws of the United States.

*Id.* The Court later reiterated this point by taking care to "emphasize again that our view of the matter would be totally different had the evidence established . . . that the administrative warrant was here employed as an instrument of criminal law enforcement to circumvent the latter's legal restrictions, rather than as a bona fide preliminary step in a deportation proceeding." *Id.* at 229–

30.  The test to distinguish the two is "whether the decision to proceed administratively toward deportation was influenced by, and carried out for, a purpose of amassing evidence in the prosecution for crime."  *Id.* at 230.

Here, the administrative process was exploited in order to achieve criminal prosecution and a criminal arrest without abiding by the necessary safeguards and restrictions of the Constitution. On February 16, 2017, DO King set out as part of the Fugitive Operations team under the Enforcement and Removal Operations Unit to round up individuals as part of a "targeted enforcement action" who were known felons and aggravated felons.  Tr. at 5:25, 6:23, 24:17–25:9, 26:11–15, 26:23–25, 30:7.  This team was a specialized unit within ICE that is specifically tasked with locating and arresting high priority "targets," and arresting them.  DO King admitted that he intended on the day of the instant offense to initiate a prosecution in this case.  Tr. at 27:12–14. Indeed, he acknowledged that most ERO arrests result in prosecution—as he expected this one would—though it is not always the case.  Tr. at 63:25–64:3.

Regardless of DO King's stated or subjective intent, the data available to DO King at the time indicates that ICE intended to initiate criminal prosecution.  Mr. Madrid-Quezada was listed on the Lead Referral as a "Priority 1" target.  Tr. at 31:1–10.  Although the Lead Referral was two years old, DO King received it three or four days prior to the round up.  Tr. at 59:8–20, 67:18–20. In that time, DO King may or may not have done some initial investigation to determine at which of the two addresses listed that Mr. Madrid-Quezada was residing.  Tr. at 29:20–21, 32:7–10. Despite claims that he needed at least a "good week or two" to do additional investigation that he did not have time to do, when questioned by the Court, DO King acknowledged that the only thing remaining to do was to verify Mr. Madrid-Quezada's address.

When questioned by defense counsel, DO King acknowledged that he had sufficient information to obtain a criminal arrest warrant: "I would have had enough probable cause to draft a criminal complaint and try to get a judge to sign a criminal arrest warrant based on the information I did have." Tr. at 32:2–6. Additionally, DO King stated that any documentation or testing collected after Mr. Madrid-Quezada's arrested only affirmed what he already knew. Tr. at 12:17–22.

Finally, DO King's actions confirm that he set to arrest Mr. Madrid-Quezada not to subject him administratively to deportation, but to arrest him on criminal charges. DO King testified that, on the way to the ICE station, Mr. Madrid-Quezada asked him what was going to happen to him. In response, DO King explained the *criminal* process. Tr. at 66:11–67:6. At that point, DO King had not received any additional documents or information. The transition from allegedly being administrative in nature to a criminal prosecution all happened on the same day, within hours of arresting Mr. Madrid-Quezada. Tr. at 28:3–7. Whereas in *Abel* the defendant was held for several weeks before being charged criminally [362 U.S. at 255], here the process changed from administrative to criminal the same day, within hours of Mr. Madrid-Quezada's arrest. DO King filed a criminal complaint the next day, charging Mr. Madrid-Quezada with illegal reentry into the United States.

The Court finds that the alleged time pressure of the targeted enforcement does not excuse circumventing the proper Constitutional safeguards afforded to those accused of crimes. If DO King indeed had probable cause as he stated that he did, and he should have obtained a criminal arrest warrant, reviewable by a judge, rather than arrest Mr. Madrid-Quezada on an administrative arrest warrant only to proceed to explaining his criminal rights shortly thereafter and charge him criminally later that day.

The evidence established that the administrative warrant was employed here as an instrument of criminal law enforcement, used to circumvent the criminal process' legal restrictions. Accordingly, the Court finds that Mr. Madrid-Quezada's February 2017 arrest was illegal.

## IV.     Identity Information

DO King questioned and arrested Mr. Madrid-Quezada without a valid criminal warrant. The evidence obtained from that unconstitutional arrest should be suppressed. While the government relies on *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032 (1984) for the proposition that identity evidence may never be suppressed, subsequent cases have made clear that "*Lopez-Mendoza* does not prevent the suppression of all identity-related evidence. Rather, *Lopez-Mendoza* merely reiterates the long-standing rule that a defendant may not challenge a court's *jurisdiction* over him or her based on an illegal arrest." *Olivares-Rangel*, 458 F.3d at 1106.

Mr. Madrid-Quezada did not seek to suppress his body for jurisdictional purposes. Instead, he sought to suppress his identity-related statements and A-File because they were obtained by ICE as a result of his illegal seizure. Such suppression is proper under *Lopez-Mendoza* and at least three circuits, including the Tenth Circuit in which this Court sits. *See Olivares-Rangel*, 458 F.3d 1104 (10th Cir. 2006); *Oscar-Torres*, 507 F.3d 224 (4th Cir. 2007); *Guevara-Martinez*, 262 F.3d 751 (8th Cir. 2001).

Accordingly, the Court finds that Mr. Quezada-Madrid's statements regarding his identity were taken subsequent to the illegal arrest and as an investigatory devise to pursue the criminal charges. The statements were made shortly after Mr. Quezada-Madrid's arrest and there is no intervening event that would serve to purge the taint of the illegal arrest. The identity statements are therefore inadmissible.

With respect to the A-File, DO King could not recall whether it was requested and obtained upon receiving the Lead Referral or after the arrest. He merely speculated that he believed he had it before the arrest. Given that DO King could not testify conclusively when the A-File was obtained, and importantly whether the A-File was obtained before Mr. Quezada-Madrid's illegal arrest, it is unclear whether the A-File would constitute poisonous fruit of the illegal arrest. *See Olivares-Rangel*, 458 F.3d at 1119. Accordingly, the Court will suppress Mr. Madrid-Quezada's A-File unless the government can offer proof that the A-File was obtained before the illegal arrest.

**V.    Mr. Madrid-Quezada's Statements Should be Suppressed.**

The Court additionally finds that Mr. Madrid-Quezada did not make a knowing and intelligent waiver of his *Miranda* rights subsequent to his arrest on February 16, 2017. Mr. Madrid-Quezada's English-speaking and comprehension skills are limited. He was born in Mexico, where he attended Spanish-speaking school through the fifth grade. Tr. at 80:3–7. He has never taken English courses. Tr. at 80:8–9. Although Mr. Madrid-Quezada admitted that he sometimes speaks to his roofing clients in English, he often has an English speaker with him that can help with. He additionally speaks limited English with his children, who he described as patient with him and who know to speak slowly to him. On the day of his arrest, in contrast, Mr. Madrid-Quezada was swept up in the morning along with several others and taken back to the ICE station. He was provided *Miranda* warnings in English, but unable to review them in Spanish both because he had left his eye glasses at home and because they were not offered in Spanish despite the Lead Referral documents indicating that he was questioned in Spanish in 2000. The Court again notes that Mr. Madrid-Quezada was questioned at the hearing, assisted by a Spanish-speaking interpreter. He was asked by this Court to explain, in English, what he asked DO King during his transport to the ICE office. It was clear to this Court, upon hearing Mr. Madrid-

Quezada, that he is not proficient in the English language and could not have knowingly and intelligently waived his *Miranda* rights.

In *United States v. Alarcon*, the District of Colorado found that Mr. Alarcon did not understand his *Miranda* rights that were read to him in English. 95 F. App'x 954 (2004) (unpublished). The suppression hearing revealed that an agent asked whether Mr. Alarcon preferred to be interviewed in English or Spanish, and he said English. The officers then spoke to him in English, never asking whether he in fact understood English, and did not give him the option of having his *Miranda* rights read in Spanish. He answered "yes" when read him Miranda rights and signed the form. At his initial court appearances, he answered the magistrates' questions with "yes" or "no"—he even answered "yes, sir" when one magistrate judge asked if he understood English, but then later admitted he only understood the proceedings after they were translated for him.

At the suppression hearing, Mr. Alarcon testified that he did not understand the *Miranda* warnings, but he knew the law and understood "bits and pieces" of English. He also stated that he could only read some English words, and that his wife often translated him. However, he testified, he often feigned his understanding of English because he was embarrassed to admit his lack of proficiency. Meanwhile, the government's witnesses testified that Mr. Alarcon conversed with the officers in English and did not seem to have trouble understanding them. The Tenth Circuit found that the evidence presented at the suppression hearing could have supported either a finding that Mr. Alarcon understood English or one that he did not, and thus the District Court did not commit clear error in finding that Mr. Alarcon did not understanding the warnings.

Meanwhile, in *United States v. Sanchez-Chaparro*, the District Court found that the Mr. Sanchez-Chaparro made a knowing and voluntary waiver of his Miranda rights even though he

was not a native English speaker. 392 F. App'x 639 (10th Cir. 2010) (unpublished). In *Sanchez-Chaparro*, the defendant generally responded to the officer's questions during a traffic stop and asked the officer whether there would be a Spanish-speaker at the police station. However, once at the station, Mr. Sanchez-Chaparro never asked for a translator. The officer noted that Mr. Sanchez-Chaparro had some difficulty with the warnings and asked him, in Spanish, if he understood. Mr. Sanchez-Chaparro responded that he did.

Here, Mr. Madrid-Quezada was questioned in English subsequent an illegal arrest. Despite DO King's belief that Mr. Madrid-Quezada spoke "good English" and seemed to understand him, Mr. Madrid-Quezada testified that he could not understand the *Miranda* warnings. He testified that he asked for his reading glasses, and did not understand the warnings. Just as in *Alarcon*, Mr. Madrid-Quezada was never asked whether he would like his rights in Spanish. DO King admitted that his assessment of Mr. Madrid-Quezada's English proficiency was based on Mr. Madrid-Quezada answering basic questions and producing his identification when asked to do so. These questions did not require complex answers, and DO King could not recall whether Mr. Madrid-Quezada answered questions using more than one or two words. DO King also admitted to his own limited Spanish ability, yet he was responsible for ensuring Mr. Madrid-Quezada understood his questions and did not need an interpreter. Also, as in *Alarcon*, even though Mr. Madrid-Quezada may have signed the *Miranda* warnings in acknowledgement of his rights, this does not conclusively determine that he in fact understood what he was signing. This is particularly true in this case as Mr. Madrid-Quezada was unable to read the document in front of him because he did not have his glasses. Accordingly, the Court finds that Mr. Madrid-Quezada's statements should be suppressed.

**CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part Mr. Madrid-Quedaza's

Motion to Suppress. Doc. 45.

Dated this 23rd day of July, 2019.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE

Alejandro Fernandez                    Jason Wisecup
*Attorney for Mr. Madrid-Quezada*      *Assistant United States Attorney*